## UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

| | | |
|---|---|---|
| *UNITED STATES OF AMERICA* | ) | |
| | ) | |
| *v.* | ) | *No. 2:10-cr-136-DBH* |
| | ) | |
| *SHAREEF NASH, et al.,* | ) | |
| | ) | |
| *Defendants* | ) | |

### MEMORANDUM DECISION ON HEARING REQUEST AND MOTIONS TO STRIKE AND RECOMMENDED DECISION ON MOTIONS TO SUPPRESS

Defendant Hasan Worthy, indicted on (i) one count of conspiring to possess, with intent to distribute, a mixture or substance containing cocaine base, a mixture or substance containing cocaine, and a mixture or substance containing heroin, and aiding and abetting such conduct, in violation of 21 U.S.C. §§ 846 and 841(a)(1) and 18 U.S.C. § 2, (ii) two counts of possessing, with intent to distribute, a mixture or substance containing cocaine, and aiding and abetting such conduct, in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2, and (iii) one count of intentionally using a communication facility, a telephone, in committing, causing, and facilitating one or more other offenses set forth in the indictment, in violation of 21 U.S.C. § 841(a)(1) or 844, *see* Third Superseding Indictment (Docket No. 232), moves to suppress any and all audio recordings, text messages, or other information collected by the government pursuant to this court's orders authorizing interception of wire and electronic communications, as well as any and all evidence that is the fruit of such recordings or information, including evidence obtained with warrants secured as a result of such recordings or information, *see* Defendant's Motion To Suppress ("Worthy Motion") (Docket No. 218) at 1.

One of Worthy's co-defendants, Shareef Nash, joins Worthy's motion in part and separately moves to suppress intercepted communications on grounds that (i) the wiretaps were unnecessary, and (ii) the monitoring of conversations was not properly minimized. *See* Motion To Suppress . . . Intercepted Telephone Conversations ("Nash Motion") (Docket No. 256).[1] Six other co-defendants, Daneek Miller, Sasha Phillips, John Palaia, Veronica Brown, Nicole Webster Gersy, and Regina Goins, join the Worthy and Nash motions. *See* Notice (Miller) (Docket No. 257); Joinder in Motions #218 and #256 (Phillips) (Docket No. 260); Notice of Joinder (Palaia) (Docket No. 262); Notice (Brown) (Docket No. 267); Joinder in Motions #218 and #256 (Docket No. 275) (Webster Gersy); Joinder in Motions #218 and #264 (Goins) (Docket No. 310).[2]

On January 25, 2011, following the referral to me of the Worthy and Nash motions to suppress, I held a conference with counsel to discuss Worthy's request for an evidentiary hearing. *See* Report of Conference of Counsel and Order ("Conference Report") (Docket No. 318) at 1; Worthy Motion at 13 (seeking "a hearing to determine the veracity of the affidavits submitted by the government in supports of its applications for the wiretap orders . . ., the credibility of the government's informants, and, the nature [o]f the government's efforts to minimize interception of communications not subject to the wiretap orders."). I ordered that Worthy submit a supplemental brief addressing specified issues, to which I afforded the government an opportunity to respond. *See id*. at 2-3. Those briefs were duly filed. *See* Defendant Worthy's Supplemental Memorandum in Support of Motion To Suppress Wire

---

[1] Nash also filed a separate motion to suppress evidence seized pursuant to a search warrant. *See* Motion To Suppress . . . Search of 71 Old Orchard Road, Buxton, Maine (Docket No. 264). I am today issuing a separate recommended decision with respect to that motion.
[2] Presumably, Goins intended to refer to "Motion #256" instead of "Motion #264." Unlike Phillips, who expressly joined in Docket No. 264, *see* Docket No. 265, Goins did not state that she had standing to move to suppress evidence seized in the search of 71 Old Orchard Road, Buxton, Maine. To the extent that Goins did mean to join Docket No. 264, I treat her joinder in that motion in the same fashion as Phillips' joinder.

Intercepts ("Supplemental Brief") (Docket No. 324); Government's Reply to Defendant Worthy's Supplemental Memorandum of Law in Opposition to Motion To Suppress Wire Intercepts with Incorporated Motion To Strike ("Supplemental Response") (Docket No. 334).

In responding, the government, *inter alia*, moved to strike portions of Worthy's supplemental brief that it argued exceeded the scope of my order. *See* [Motion To Strike/Government] (Docket No. 336) (incorporating Supplemental Response at 1-2). In response, Worthy moved to strike the government's motion to strike and, alternatively, opposed it on the merits. *See* [Motion To Strike/Worthy] (Docket No. 339) (incorporating Defendant Worthy's Objection to the Government's Motion To Strike, with Incorporated Motion To Strike ("Strike Objection/Worthy") (Docket No. 338) at 5).

For the reasons that follow, I deny Worthy's motion to strike, grant the government's motion to strike, deny Worthy's request for an evidentiary hearing, and recommend that the court deny the Worthy and Nash motions to suppress.

## I. Applicable Legal Standards

The interception of electronic communications as an investigative technique is governed by Title III of the Omnibus Crime Control and Safe Streets Act, 18 U.S.C. §§ 2510-22 ("Title III"). *See United States v. David*, 940 F.2d 722, 727 (1st Cir. 1991). Title III confers standing on any "aggrieved person" to move to suppress evidence derived from electronic surveillance. *See* 18 U.S.C. § 2518(10)(a). An "aggrieved person" is defined as "a person who was a party to any intercepted wire, oral, or electronic communication or a person against whom the interception was directed[.]" *Id*. § 2510(11). The government does not contest that the defendants who have moved to suppress intercepted communications, or joined in motions to do so, have standing to seek suppression of those communications. *See generally* Government's

Memorandum of Law in Opposition to Motion To Suppress Wire Intercepts ("Opposition") (Docket No. 274).

Worthy seeks to suppress intercepted communications on grounds that the government failed to make the requisite showings of necessity or probable cause for the wiretaps and failed to properly minimize the interception of calls. *See* Worthy Motion at 4-12. Nash seeks to suppress such communications on grounds of lack of a showing of necessity and failure to minimize calls. *See* Nash Motion at [2].

### A. Necessity

The so-called "necessity" requirement is "designed to assure that wiretapping is not resorted to in situations where traditional investigative techniques would suffice to expose the crime." *United States v. Rivera-Rosario*, 300 F.3d 1, 18 (1st Cir. 2002) (citation and internal quotation marks omitted). An application for an order authorizing the interception of a wire, oral, or electronic communication must include, *inter alia*:

> **(c)** a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous;
>
> ***
>
> **(f)** where the application is for the extension of an order, a statement setting forth the results thus far obtained from the interception, or a reasonable explanation of the failure to obtain such results.

18 U.S.C. § 2518(1).

In issuing an order authorizing wiretapping, an issuing judge must, *inter alia*, determine on the basis of the facts submitted by the applicant that "normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous[.]" *Id.* § 2518(3)(c).

To demonstrate necessity, "the government is not required to show that other investigatory methods have been completely unsuccessful, nor is the government forced to run outlandish risks or to exhaust every conceivable alternative before resorting to electronic surveillance." *Rivera-Rosario*, 300 F.3d at 19 (citations omitted). Instead, "the government must demonstrate that it has made a reasonable, good faith effort to run the gamut of normal investigative procedures before resorting to means so intrusive as electronic interception of telephone calls." *United States v. López*, 300 F.3d 46, 52 (1st Cir. 2002) (citation and internal quotation marks omitted).

## B. Probable Cause

With respect to probable cause:

The procedures for the authorization of electronic surveillance are found in 18 U.S.C. § 2518. As to probable cause, the statute provides that a judge may authorize a wiretap upon a determination that "there is probable cause for belief that an individual is committing, has committed, or is about to commit a particular offense enumerated in section 2516 of this chapter," *Id.* § 2518(3)(a), and that "there is probable cause for belief that particular communications concerning that offense will be obtained through such interception." *Id.* § 2518(3)(b).[3]

\*\*\*

The probable cause showing required by section 2518 for electronic surveillance does not differ from that required by the fourth amendment for a search warrant. The Supreme Court has clearly delineated the standard which an issuing judge must follow in determining whether probable cause supports a warrant, as well as the duty of a reviewing court. The task of the issuing magistrate is simply to make a practical, commonsense decision whether, given all the circumstances set forth in the affidavit before him, including the "veracity" and "basis of knowledge" of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place. And the duty of a reviewing court is simply to ensure that the magistrate had a substantial basis for concluding that probable cause existed.

---

[3] The offenses enumerated in 18 U.S.C. § 2516 include "any offense involving . . . the manufacture, importation, receiving, concealment, buying, selling, or otherwise dealing in narcotic drugs, marihuana, or other dangerous drugs, punishable under any law of the United States[.]" 18 U.S.C. § 2516(e).

*United States v. Macklin*, 902 F.2d 1320, 1324 (8th Cir. 1990) (citations and internal punctuation omitted); *see also, e.g., United States v. Fairchild*, 189 F.3d 769, 775 (8th Cir. 1999) ("Specifically, probable cause is present if the totality of the circumstances reveals that there is a fair probability that a wiretap will uncover evidence of a crime."); *United States v. Domme*, 753 F.2d 950, 954 n.2 (11th Cir. 1985) ("A wiretap application need not provide probable cause of criminal activity for each person named in an application[.] What is required is sufficient information so that a judge could find probable cause to believe that the telephone in question is being used in an illegal operation.") (citations omitted).

### C.  Minimization

Pursuant to 18 U.S.C. § 2518(5), "[e]very order and extension thereof shall contain a provision that the authorization to intercept . . . shall be conducted in such a way as to minimize the interception of communications not otherwise subject to interception under this chapter[.]" 18 U.S.C. § 2518(5).  The minimization requirement "spotlights the interest in confining intrusions as narrowly as possible so as not to trench impermissibly upon the personal lives and privacy of wiretap targets and those who, often innocently, come into contact with such suspects[.]" *United States v. Hoffman*, 832 F.2d 1299, 1307 (1st Cir. 1987).

The standard for judging minimization efforts is one of "objective reasonableness." *United States v. Charles*, 213 F.3d 10, 22 (1st Cir. 2000) (citations and internal quotation marks omitted).  "The statute does not forbid the interception of all nonrelevant conversations, but rather instructs the agents to conduct the surveillance in such a manner as to 'minimize' the interception of such conversations." *Scott v. United States*, 436 U.S. 128, 140 (1978); *see also, e.g., López*, 300 F.3d at 57 (the standard is one "of honest effort; perfection is usually not attainable, and is certainly not legally required") (citations and internal quotation marks omitted);

*Charles*, 213 F.3d at 22 ("[T]he critical inquiry is whether the minimization effort was managed reasonably in light of the totality of the circumstances.").

### D.  Standard of Review; Appropriateness of Evidentiary Hearing

"A wiretap authorization order is presumed proper, and the Defendants carry the burden of overcoming this presumption." *United States v. Mondragon*, 52 F.3d 291, 292 (10th Cir. 1995) (citation and internal quotation marks omitted).  Typically, the task of a reviewing court examining an issuing judge's wiretap order in the context of a motion to suppress is to "examine[] the face of the affidavit and decide[] if the facts set forth in the application were minimally adequate to support the determination that was made[.]" *United States v. Villarman-Oviedo*, 325 F.3d 1, 9 (1st Cir. 2003) (citation and internal quotation marks omitted).  "That is, the sufficiency of the affidavit is to be upheld where the [reviewing] court determines that the issuing court could have reasonably concluded that normal investigatory procedures reasonably appeared to be unlikely to succeed." *López*, 300 F.3d at 53 (citation and internal punctuation omitted); *see also, e.g., Rivera-Rosario*, 300 F.3d at 19 n.23 ("When reviewing a wiretap application, it is not our province to engage in *de novo* review of an application; instead, we test it in a practical and commonsense manner to determine whether the facts which it sets forth are minimally adequate to support the findings made by the issuing judge.") (citations and internal punctuation omitted).

The same standard pertains when the district court "is 'reviewing' the prior district court authorization of a wiretap application in the course of a suppression motion challenging the facial sufficiency of the affidavit." *United States v. Ashley*, 876 F.2d 1069, 1074 (1st Cir. 1989). "This inquiry is not rigid or rule-oriented; to the precise contrary, Title III demands a practical,

commonsense approach to exploration of investigatory avenues and relative intrusiveness." *David*, 940 F.2d at 728 (citation and internal quotation marks omitted).

In the context of a motion to suppress evidence gathered pursuant to a wiretap order, an evidentiary hearing is warranted only when a defendant has made either "a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and . . . is necessary to the finding of probable cause" or a showing of a material omission in the government's application. *Rivera-Rosario*, 300 F.3d at 20 (citation and internal quotation marks omitted).

With respect to alleged insufficient minimization, the defendant bears the burden of making a *prima facie* showing of contested facts justifying a hearing. *See United States v. Giacalone*, 853 F.2d 470, 482-83 (6th Cir. 1988).

## II.  Motions To Strike

### A.  Worthy's Motion To Strike

During my January 25 conference with counsel, I raised concerns that Worthy "(i) had supplied, for the first time in his reply brief, detailed argumentation in support of his hearing request, appending some 130 pages of supporting materials thereto, . . . (ii) had omitted to supply pinpoint citations in support of propositions advanced in his reply brief, and, (iii) in some cases, had failed to supply any citation at all."  Conference Report at 1.  I also questioned whether, as indicated by the absence of any mention of the point in his reply brief, Worthy no longer pressed for an evidentiary hearing with respect to the government's minimization procedures.  *See id.* at 1-2.

I ordered that Worthy file, no later than February 8, 2011, "a supplemental brief (i) providing pinpoint citations to the record materials submitted in support of his arguments in

favor of an evidentiary hearing, (ii) clarifying whether he presses a request for an evidentiary hearing with respect to the government's minimization procedures and, if so, on what basis, (iii) supplying specific record citations and legal authority in support of his argument that material information was omitted from affidavits submitted in support of the wiretap applications, and (iv) addressing why, in view of the extrinsic evidence already produced, an evidentiary hearing is necessary." *See id*. at 2-3. I ordered that the government file any response no later than February 22, 2011. *See id*. at 3. I noted that Worthy was granted the opportunity to supplement his earlier filings "without prejudice to any argument the government might wish to make that Mr. Worthy had failed in the first instance to make the showing necessary to warrant an evidentiary hearing." *Id*. at 2.

Subsequently, I granted a motion by Worthy, consented to by the government, to extend his supplemental brief filing deadline to February 11 and that of the government to February 25, *see* Docket Nos. 319-20, a motion by Worthy to extend his supplemental brief filing deadline to February 14 and that of the government to February 28, *see* Docket Nos. 322-23, and an unopposed motion by the government to extend its deadline to March 11, *see* Docket Nos. 329-30.

Worthy moves to strike the government's motion to strike on the basis that it is untimely, the government having sought and received his consent only to an extension of time to file a response to the supplemental brief, not to file a motion to strike. *See* Strike Objection/Worthy at 5. Worthy's argument is without merit. The government's motion to strike is an integral part of its response to Worthy's supplemental brief. Its response was timely filed, not only with Worthy's consent but also, more importantly, with leave of the court, on March 11, 2011. *See* Docket No. 334. Worthy's motion to strike accordingly is **DENIED**.

## B.  Government's Motion To Strike

The government moves to strike the following portions of Worthy's supplemental brief, which it contends constitute new arguments exceeding the scope of my January 25 order permitting supplemental briefing: (i) a challenge to the wire intercepts based on lack of judicial oversight, (ii) a challenge to the wire intercepts based on the claim that the orders authorizing them were overbroad in agency authorization and description of offenses, and (iii) the contention that the wire intercepts should be suppressed on necessity grounds because the government failed to discuss the investigative technique that Worthy contends it ultimately employed.  *See* Supplemental Response at 2.  I agree.

The first two of the three challenged arguments pertain to the issue of minimization.  In his initial motion, Worthy argued that the sheer volume of intercepted recordings produced in discovery, 4,600 calls as well as numerous messages, suggested that the government failed to minimize interception of communications subject to the wiretap orders in question.  *See* Worthy Motion at 12.  He requested a hearing for the purpose of inquiring into the government's efforts to minimize its intrusion into his privacy, reasoning that the government, alone, had access to all of the data that it had accumulated and the exact procedures used to minimize illegal interceptions.  *See id.*

With respect to the issue of minimization, the government rejoined that Worthy relied solely upon the volume of calls intercepted, which had no bearing on the adequacy of minimization efforts, and failed to identify a single specific call that was purportedly inadequately minimized.  *See* Opposition at 18.  It contended that Worthy's failure to identify specific, purportedly inadequately minimized calls was fatal to his request for an evidentiary hearing on its minimization efforts.  *See id.* at 20-21.

In his reply brief, Worthy greatly expanded upon his request for an evidentiary hearing but omitted mention of the need for a hearing to examine the government's minimization efforts. *See generally* Defendant Worthy's Reply Memorandum in Support of Motion To Suppress Wire Intercepts ("Worthy Reply") (Docket No. 303).

Against that backdrop, at the January 25 conference with counsel, I questioned whether Worthy had waived his request for a hearing insofar as it bore on the adequacy of the government's minimization efforts. *See* Conference Report at 1-2. At his counsel's request, I permitted him the opportunity to clarify whether he pressed *for an evidentiary hearing* with respect to the government's minimization procedures and, if so, on what basis. *See id.* at 2. I did not provide leave to devise entirely new substantive arguments with respect to minimization. *See id.*[4] Worthy's arguments, made for the first time in his supplemental brief, that there was a lack of judicial oversight of the government's minimization efforts, including the adoption of assertedly overly broad language in the court's wiretap authorization orders that conferred undue discretion on investigating agents, *see* Supplemental Brief at 8-11, and that the court's wiretap orders were sufficiently deficient to justify suppression of intercepted communications on that ground alone, *see id.* at 19-20, exceed the confines of my order permitting briefing. Thus, they are appropriately stricken.

In a similar vein, as the government points out, *see* Supplemental Response at 2, Worthy raised for the first time in his supplemental brief an argument that the affidavits submitted in support of the wiretap applications omitted important information bearing on the necessity of the wiretaps, namely, the expected efficacy of the arrest and indictment strategies ultimately

---

[4] Worthy incorrectly states, in his opposition to the government's motion to strike, that the court requested discussion "concerning whether a hearing *or suppression or both* are appropriate with respect to the government's failure to minimize." Strike Objection/Worthy at 5-6 (emphasis added).

employed in this case, which Worthy surmises the government may already have been contemplating when it prepared its wiretap applications, *see* Supplemental Brief at 18-19. By my order of January 25, Worthy was directed, in relevant part, to "provid[e] pinpoint citations to the record materials submitted in support of his arguments in favor of an evidentiary hearing" and to "supply[] specific record citations and legal authority in support of his argument that material information was omitted from affidavits submitted in support of the wiretap applications[.]" Conference Report at 2-3. He was thereby directed, and permitted the opportunity, to address deficiencies in his papers. He was not permitted the opportunity to identify additional alleged material omissions that might justify an evidentiary hearing.[5]

To the extent that Worthy suggests, in the alternative, that he timely raised new bases for suppression because no motion deadline ever was set with respect to the second and third superseding indictments against him, *see* Strike Objection/Worthy at 4, 6, he errs. In this district, as in others, the filing of a superseding indictment does not automatically affect pretrial motions filed on the prior indictment, or extend pretrial motion filing deadlines. Action is required by a judge, whether on motion of a party or *sua sponte*. *See, e.g., United States v. Bazuaye*, No. 03 CR. 12(KTD), 2004 WL 784835, at *5 (S.D.N.Y. Apr. 12, 2004), *aff'd*, 311 Fed. Appx. 382 (2d Cir. 2008) ("The filing of a superseding indictment does not have an effect on the pretrial motions filed on the original indictment unless the district court has ruled that the superseding indictment moots the pending motions.") (citation and internal quotation marks omitted).

Moreover, while Worthy protests the unfairness of permitting the government to file

---

[5] In opposing the government's motion to strike, Worthy argues, *inter alia*, that because the government submitted new material in its response to Worthy's supplemental brief, including a supplemental affidavit and examples of previously withheld minimization evidence, he should be permitted to make the arguments the government now seeks to strike. *See* Strike Objection/Worthy at 6. This assertion is without merit. Worthy was permitted to file a supplemental brief addressing selected matters, to which the government was permitted to respond. Worthy's supplemental brief exceeded the permitted scope. By contrast, the government confined itself to responding to the points raised in Worthy's supplemental brief.

superseding indictments adding or deleting charges without affording defendants an opportunity to supplement their motions, *see* Strike Objection/Worthy at 7, from all that appears, he could have raised every one of the three arguments at issue when he filed his initial motion to suppress. Even construing his argument, liberally, as a motion for leave to file a supplemental motion to suppress, he makes no compelling case for enlargement of the motion filing deadline "[f]or good cause[.]" Fed. R. Crim. P. 12(e).

For the foregoing reasons, the government's motion to strike is **GRANTED**, and the following arguments in Worthy's supplemental brief are disregarded: (i) a challenge to the wire intercepts based on lack of judicial oversight, (ii) a challenge to the wire intercepts based upon the claim that the orders authorizing them were overbroad in agency authorization and description of offenses, and (iii) the contention that the wire intercepts should be suppressed on necessity grounds because the government failed to discuss the investigative technique that Worthy contends it ultimately employed.

### III.  Request for Evidentiary Hearing

Worthy seeks an evidentiary hearing on grounds that (i) the two affidavits of United States Drug Enforcement Agency ("DEA") agent Kristine Tierney submitted in support of the government's June 2010 and July 2010 applications for wiretap authorizations contain several false statements, *see* Worthy Reply at 2-7; Supplemental Brief at 12-18, 20-23, (ii) those affidavits contain material omissions, *see* Worthy Reply at 7; Supplemental Brief at 22, and (iii) the government's failure to minimize appears widespread, although the extent of that failure is difficult to measure without a hearing given the government's apparent failure to follow promised minimization procedures, *see* Supplemental Brief at 3-6, 12.

Defendants bear the burden of demonstrating the necessity of an evidentiary hearing.

*See, e.g., Giacalone*, 853 F.2d at 483 ("Who bears the burden of production and persuasion at the evidentiary hearing is irrelevant to the separate issue of whether an evidentiary hearing should be held in the first place. And, as the district court ruled, a defendant must make at least some initial showing of contested facts to be entitled to such a hearing."). For the reasons that follow, Worthy has not carried that burden in this case.

## A. Alleged False Statements

Worthy identifies six allegedly false statements contained in the Tierney affidavits. *See* Supplemental Brief at 21-23; *see also* Worthy Reply at 6-7. For the reasons that follow; he falls short of making the requisite "substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit[.]" *Rivera-Rosario*, 300 F.3d. at 20:

1. That the government did not have sufficient information to identify Nash. *See* Worthy Reply at 2-3; Supplemental Brief at 14-17, 21; Affidavit in Support of Application for Authorization To Intercept Wire and Electronic Communications ("First Tierney Aff."), Exh. B to Application for Interception of Wire and Electronic Communications (Docket No. 1), *In re Application of U.S. for Order Authorizing Interception of Wire & Elec. Commc'ns* ("*First Wiretap Case*"), No. 2:10-mc-150-DBH (D. Me.), ¶ 75; Affidavit in Support of Application for Authorization To Intercept Wire and Electronic Communications ("Second Tierney Aff.") (Docket No. 2), *In re Application U.S. for Order Authorizing Interception of Wire & Elec. Commc'ns ("Second Wiretap Case")*, No. 2:10-mc-165-DBH (D. Me.), ¶ 30. As the government points out, *see* Supplemental Response at 5, this is an obvious typographical error, Tierney having elsewhere discussed the government's identification of Nash as a target subject, *see, e.g*., First Tierney Aff. ¶ 16(B); Second Tierney Aff. ¶ 17(B). The error accordingly was

harmless and immaterial.

2.      <u>That the government did not have sufficient information to identify Nash's suppliers</u>.  *See* Worthy Reply at 4; Supplemental Brief at 21; First Tierney Aff. ¶ 75; Second Tierney Aff. ¶ 30.  Worthy argues that this statement was, at the least, misleading because Tierney had elsewhere, in both of her affidavits, identified Miller as a supplier.  *See* Supplemental Brief at 21.  With respect to Miller, the statement was plainly wrong, Tierney having made clear elsewhere in her affidavits that agents believed Miller to be supplying the bulk of the cocaine to the Nash organization.  *See, e.g.*, First Tierney Aff. ¶ 16(K)(iii); Second Tierney Aff. ¶ 17(K)(iii).  The error was obvious and, thus, harmless and immaterial.  Worthy adduces no evidence calling into question the veracity of the statement with respect to other suppliers, Tierney having indicated that agents had not identified the suspected supplier of bulk heroin and were not confident that they had identified all potential suppliers.  *See, e.g.*, First Tierney Aff. ¶¶ 16, 75, 99; Second Tierney Aff. ¶¶ 17, 30, 51.  Indeed, the government adduces evidence that it still has not identified the individual(s) who supplied Nash and others in two drug transactions that occurred during the wire intercepts.  *See* Supplemental Response at 7; Affidavit ("New Tierney Aff.") (Docket No. 335) ¶¶ 8-9.

3.      <u>That the government did not have sufficient information to charge Nash</u>.  *See* Worthy Reply at 2-4; Supplemental Brief at 14-17, 21; First Tierney Aff. ¶ 75; Second Tierney Aff. ¶¶ 30, 52.  Worthy argues that this statement was false in view of discovery showing that (i) a confidential informant had told the government in January 2010 that Nash headed a drug trafficking organization and had described some details of its operation, *see* Supplemental Brief at 14; Exh. A to Worthy Reply; (ii) on January 22, 2010, Tierney, acting as an undercover agent, was able to purchase crack cocaine from an intermediary, Goins, immediately after Nash

delivered it to Goins, *see* Supplemental Brief at 14-16; Exh. B to Worthy Reply ¶¶ 15-18, 21; (iii) at least two agents conducting surveillance during Tierney's January 22, 2010, undercover drug purchase observed the occupants of the vehicle from which Goins obtained drugs, and, on February 18, 2010, one picked Nash's photo from a photo lineup, *see* Supplemental Brief at 15-16; Exh. C to Worthy Reply ¶¶ 18-22; Exh. G to Supplemental Brief at R072-0001, (iv) the government had installed a pole camera outside of Nash's home in Buxton, Maine, from April through July 2010, and the camera documented that on July 28, 2010, Nash appeared to bury something in his yard, *see* Supplemental Brief at 16; Exh. H thereto at R207-0001-02; and (v) the government had obtained at least some travel and financial records of Nash and Phillips that potentially helped document trips to New York to secure drugs, *see* Supplemental Brief at 16-17; Exh. E to Worthy Reply.

The government persuasively counters that, in so arguing, Worthy equates "information" with "evidence." *See* Supplemental Response at 6-7. As the government notes, Worthy himself has elsewhere questioned the reliability and veracity of the government's confidential informants. *See id.* at 6; Worthy Motion at 10-12. The government represents that, during the January 22, 2010, undercover purchase, no witness observed what occurred in the vehicle, no audio or video recording captured what transpired there, and Nash was one of two occupants of the vehicle. *See* Supplemental Response at 7. As the government observes, *see id.*, "a defendant's mere presence at the scene of the crime alone is generally insufficient proof of his participation in the crime[,]" *United States v. Angulo-Hernández,* 565 F.3d 2, 7 (1st Cir. 2009) (citation and internal quotation marks omitted). While Nash was observed, by means of the pole camera, apparently burying something in his yard, Worthy points to no report or other evidence that investigators were able to confirm that Nash had buried drugs or any other item related to

the alleged drug conspiracy. Finally, as the government notes, *see* Supplemental Response at 7 n.3, Worthy acknowledges that much of the substance of the discovery on which he now relies to illuminate the falsity of Tierney's statement was summarized in her affidavits, *see* Supplemental Brief at 16, weighing heavily against any finding of knowing or reckless misrepresentation.

4.　<u>That the government did not know the location where Nash stored drugs</u>.　*See* Worthy Reply at 7; Supplemental Brief at 21. Worthy does not identify the precise sections of the Tierney affidavits in which this statement is made, and the government states that it is unable to find it. *See* Supplemental Response at 8. Worthy perhaps refers to Tierney's statements that the wiretaps were expected to disclose the identification of the site(s) being used for the storage and concealment of cocaine base, cocaine, and/or heroin. *See* First Tierney Aff. ¶ 13(d); Second Tierney Aff. ¶ 14(d). In any event, as the government notes, *see* Supplemental Response at 8, Tierney disclosed what Worthy says she should have disclosed: that Nash and his associates appeared to store drugs at Nash's Buxton residence, although agents did not know when the drugs were present or where on the property they were kept, *see* First Tierney Aff. ¶ 99; Second Tierney Aff. ¶ 51; *see also* Supplemental Brief at 21; Exh. A to Worthy Reply.[6]

5.　<u>That Tierney had probable cause to believe, and did believe, that the targets were committing money laundering offenses and that communication intercepts would identify the existence, location, and disposition of proceeds of drug dealing activities and details of the money laundering operations</u>.　*See* Worthy Reply at 5-6; Supplemental Brief at 7-8, 13-14, 22;

---

[6] Worthy also challenges the veracity of Tierney's statement that the execution of a search and seizure warrant at Nash's house was not possible at that time because the government did not know when drug shipments arrived. *See* Supplemental Brief at 21; First Tierney Aff. ¶ 99; Second Tierney Aff. ¶ 51. He asserts that the government had information that the cocaine was replenished whenever the store was low, reasoning that the timing of a shipment was not crucial because stores were always present. *See* Supplemental Brief at 21. Worthy does not provide a citation to discovery materials containing this information, and the government represents that it cannot find it. *See* Supplemental Response at 8. Assuming *arguendo* that such materials exist, the government makes a plausible argument that the timing of shipments was, in fact, critical: Had a *de minimis* quantity of drugs been seized during execution of a search warrant at the Nash property, there would have been insufficient evidence to establish the conspiratorial conduct involved in this case. *See* Supplemental Response at 8.

First Tierney Aff. ¶¶ 6(d), 76(c)-(e), 97, 99; Second Tierney Aff. ¶¶ 7(d), 14(e), 32(c)-(e), 50- 51. Worthy challenges this statement on grounds that (i) the financial records of Phillips that the government subpoenaed reveal no evidence of money laundering, *see* Exh. E to Worthy Reply, (ii) no other discovery provided to Worthy evidences money laundering, (iii) despite Tierney's certitude, in her first affidavit, that the requested wiretap would reveal evidence of money laundering, she did not, in her second affidavit, identify any such evidence as having been collected as a result of the first wiretap, and (iv) despite Tierney's statement that she had probable cause to believe that the crime of money laundering had been committed, no defendant has in fact been charged with such a crime in this case, *see* Supplemental Brief at 7-8, 13-14.

The government rejoins that Tierney's assertions were based on her knowledge of the realities of drug trafficking, in which drug trafficking and money laundering are intertwined, and that the wire intercepts did in fact reveal asserted money laundering activities and the existence, location, and disposition of proceeds of drug dealing activities, including (i) paying drivers to transport retail drug sellers while they conducted drug transactions, (ii) using drug proceeds to rent cars used to distribute drugs, (iii) using drug proceeds to pay rent, (iv) using drug proceeds to purchase cell phones used by drug traffickers, and (v) delivering drug proceeds to purchase additional drugs. *See* Supplemental Response at 8-9; New Tierney Aff. ¶ 10.

In so arguing, the government in effect concedes that Tierney's statement, at least in her first affidavit, was founded on general knowledge and expertise rather than specific evidence garnered as of the time of execution of that affidavit. Yet, a specially trained agent such as Tierney legitimately may draw upon her knowledge and expertise in crafting an affidavit in support of a wiretap application. *See, e.g., Ashley*, 876 F.2d at 1072 "([T]he issuing court may properly take into account affirmations which are founded in part upon the experience of

specially trained agents.").  In the circumstances, Worthy does not make a substantial showing, sufficient to warrant an evidentiary hearing, that the challenged statement was knowingly or intentionally false or made with reckless disregard for its truth.[7]

6.  That Tierney had probable cause to believe, and did believe, that intercepting wire and electronic communications would identify the "precise roles" of the so-called target subjects and other conspirators.  *See* Worthy Reply at 5; Supplemental Brief at 17-18, 22-23; First Tierney Aff. ¶¶ 13(b)-(c), 73, 100; Second Tierney Aff. ¶¶ 14(b)-(c), 28, 53.  Worthy argues that Tierney supplied no basis for her asserted belief that the wire intercepts would generate the promised precision, *see* Worthy Reply at 5, and that, on its face, this was a sufficiently absurd, hyperbolic, and unattainable goal as to render the statement false, *see* Supplemental Brief at 17-18, 22-23.  He observes that, in fact, this goal was not accomplished through the first wiretap, as a result of which Tierney reiterated the statement in seeking the wiretap of two additional phones.  *See id.* at 17-18.

The government rejoins that Tierney's assertions were correct when made and were borne out by the fruits of the wire intercepts, which demonstrated, for example, that, with respect to at least one transaction on August 3, 2010, Miller was serving not as a supplier, as originally thought, but more as an intermediary between an unidentified supplier and Nash, that persons working the various phones had clearly defined roles, responsibilities, and customer bases, and that some of the street dealers assumed additional responsibilities such as recruiting drivers and obtaining vehicles.  *See* Supplemental Response at 10-11; New Tierney Aff. ¶ 9.

Worthy falls short of making a substantial showing, sufficient to warrant an evidentiary hearing, that this challenged statement was knowingly or intentionally false or made with

---

[7] Indeed, with the benefit of hindsight, it is apparent that Tierney correctly predicted, at the least, that the wiretaps would reveal evidence of the existence, location, and disposition of drug dealing proceeds.  *See* New Tierney Aff. ¶ 10.

reckless disregard for its truth.

## B.  Alleged Material Omissions

Worthy further asserts that Tierney omitted material information from her affidavits in the form of substantial evidence identifying Nash and corroborating his involvement in the offenses.  *See* Supplemental Brief at 22.  He contends, for example, that neither affidavit detailed the length of time that the government located a pole camera outside of Nash's home or the five compact discs of images recorded and preserved from the pole camera.  *See id*.  He argues that this default was particularly severe with respect to the second affidavit, which adopted the first affidavit but omitted to set forth the greater detail contained in the first one.  *See id*.  Worthy reasons that the detail in the first affidavit, together with the discovery he summarizes, establish the falsity of Tierney's repeated assertions that the government did not have sufficient evidence to charge Nash.  *See id*.

Worthy falls short of establishing entitlement to an evidentiary hearing on this basis.  First, I have already concluded that the detail contained in the first affidavit, together with the discovery summarized by Worthy, do not reveal any falsity in Tierney's assertion.  Second, as the government points out, *see* Supplemental Response at 10, Worthy fails to identify any event or series of events captured on the pole cameras that changes the substance of the discussion outlined in the affidavits relating to pole cameras and their shortcomings in the investigation at issue.  Third, Tierney effectively incorporated all details contained in her first affidavit into her second, having incorporated it by reference and attached it to her second affidavit.  *See* Second Tierney Aff. ¶ 6 & Exh. 1 thereto.

## C.  Minimization

In both of her affidavits in support of the government's wiretap applications, Tierney

promised that minimization requirements would be strictly followed and that, *inter alia*, agents would prepare logs regarding the date and time of calls, the parties involved, the subjects of the calls, and if and when minimization occurred, and would file with the court, on or about the 15th day following commencement of the wiretap, reports detailing the course of the interception, with a particular emphasis on minimization procedures. *See* First Tierney Aff. ¶¶ 103, 107; Second Tierney Aff. ¶¶ 56, 60.

Worthy seeks a hearing regarding the government's minimization efforts on two bases: that (i) discovery to date indicates that there was a widespread failure to minimize and to follow appropriate minimization procedures, and (ii) the government has not yet produced copies of its promised reports to the court, impeding his ability to evaluate the extent of judicial supervision of the wiretapping. *See* Supplemental Brief at 3-6, 12.

In support of the first of these bases for a hearing, Worthy submits an analysis from counsel Bradford Bowman of samples of line sheets reflecting the interception of approximately 8,103 communications pursuant to the wiretaps. *See* Supplemental Brief at 3-6; Affidavit of Bradford R. Bowman ("Bowman Aff.") (Docket No. 325) ¶ 2. Bowman concluded that there appeared to have been a widespread failure to minimize and/or a widespread failure to follow promised minimization procedures. *See* Supplemental Brief at 3-6; Bowman Aff. ¶ 13(d). However, he acknowledged that the government's apparent failure to document its minimization efforts as promised rendered his analysis incomplete. *See* Supplemental Brief at 12; Bowman Aff. ¶ 13(d). Worthy reasons that, in these circumstances, an evidentiary hearing is warranted, if not essential. *See* Supplemental Brief at 12.

Critically, Bowman assumed, as the starting point for his analysis, that the line sheets produced in discovery were the minimization logs referenced in Tierney's affidavit, no other logs

having been produced. *See* Bowman Aff. ¶ 5. The government states that this assumption was fatally flawed: in fact, the line sheets are not the minimization logs. *See* Supplemental Response at 3. The government represents that it did not produce the logs because no defendant requested them and that, upon reviewing the Supplemental Brief, it immediately produced minimization logs for all calls analyzed in that brief. *See id.*

Worthy does not establish that the government (i) automatically should have produced copies of either the minimization logs or the government's reports to the court regarding its minimization efforts, or, alternatively, (ii) would not have produced those documents had he or any other defendant requested them. Indeed, insofar as appears, the logs would have been produced if requested: upon reviewing the Supplemental Brief, the government produced its minimization logs related to the calls at issue.

Worthy has been afforded ample opportunity to make his case in favor of the holding of an evidentiary hearing with respect to minimization, as well as with respect to necessity and probable cause. He has fallen short of doing so. *See United States v. Soto-Del Valle*, 102 F. Supp.2d 57, 62 (D.P.R. 2000), *aff'd*, 325 F.3d 1 (1st Cir. 2003) (denying defendants' motion for hearing on minimization issue when agent had outlined sufficient procedures to be followed in his affidavit in support of wiretap application and defendants "failed to offer any proof of outrageous or systematically inappropriate or illegal behavior during the electronic surveillance at issue").

For all of the foregoing reasons, Worthy's request for an evidentiary hearing is **DENIED**.

## IV. Merits of Motions To Suppress

Confining my review to the parties' papers and the underlying wiretap application documents, as I have determined is appropriate in this case, I recommend for the reasons that

follow that the Worthy and Nash motions to suppress be denied.

## A. Necessity

Worthy first seeks to suppress intercepted communications on the ground that the government's applications and supporting affidavits do not demonstrate, other than by conclusory statements, that other investigative techniques had been tried and failed, or appeared too dangerous or unlikely to succeed if tried. *See* Worthy Motion at 4-10; *see also Ashley*, 876 F.2d at 1072 ("[B]are conclusory statements that normal techniques would be unproductive, based solely on an affiant's prior experience, do not comply with the requirements of section 2518(1)(c)."); *United States v. Ippolito*, 774 F.2d 1482, 1486 (9th Cir. 1985) (government "must allege specific circumstances that render normal investigative techniques particularly ineffective or the application must be denied[,]" and must not "ignore avenues of investigation that appear both fruitful and cost-effective[,]" although it "need not pursue every alternative means of investigation").[8]

With respect to the first Tierney affidavit, Worthy argues that conclusory statements in paragraphs 72 and 74, *see* First Tierney Aff. ¶¶ 72, 74, are not supported by succeeding

---

[8] Worthy argues that the government misstates applicable law in arguing that the test for necessity is whether the wiretaps were required to achieve "the goals of this investigation," *see, e.g.*, Opposition at 10, Tierney having described an aggressive goal: "to identify all participants in this organization and to obtain compelling evidence against each of those persons." Worthy Reply at 1-2, 4 (quoting Second Tierney Aff. ¶ 51). Worthy contends that the government's only legitimate goal, for purposes of demonstrating the necessity of the wiretaps, was to "expose the crime." *Id.* at 1-2 (quoting *Rivera-Rosario*, 300 F.3d at 18). It is not clear to me that the government's stated goal is inconsistent with a goal of exposing the crime of conspiring to traffic in drugs. In any event, courts have recognized that the goal of being able to apprehend and prosecute all conspirators in a drug trafficking case is a legitimate one for purposes of showing the necessity of a wiretap. *See, e.g., United States v. Rivera*, 527 F.3d 891, 902 (9th Cir. 2008) ("The necessity for the wiretap is evaluated in light of the government's need not merely to collect some evidence, but to develop an effective case against those involved in the conspiracy. Thus, we have consistently upheld findings of necessity where traditional investigative techniques lead only to apprehension and prosecution of the main conspirators, but not to apprehension and prosecution of other satellite conspirators.") (citations and internal punctuation omitted); *Rivera-Rosario*, 300 F.3d at 19 (rejecting argument that traditional investigative methods sufficed when, although "the government's less intrusive methods had provided some valuable assistance in the investigation, much of the conspiracy's scope and dealings were still undisclosed"); *David*, 940 F.2d at 728-29 (rejecting defendant's necessity challenge where affiant indicated that use of traditional methods, including questioning of three informants and study of public documents and telephone toll records, had not disclosed identities of all of suspect's current drug customers or suppliers).

paragraphs, *see* Worthy Motion at 6-9, given that:

1. Tierney asserts that none of the government's informants has "contact with the entire network of conspirators, nor can they participate in conversation with most of the members of the drug distribution organization[,]" First Tierney Aff. ¶ 76, but does not state whether the informants collectively had contact with the claimed network or ability to converse with most of those whom the government believed to be members of the alleged conspiracy, *see* Worthy Motion at 7.

2. Although certain informants purportedly ceased to cooperate with the government, *see* First Tierney Aff. ¶¶ 37 n.42, 77(f), there is little discussion of why the remaining informants were no longer of use to the government or what information would be available from a wiretap that was not already available from existing sources of information, *see* Worthy Motion at 7.

3. Tierney asserts that further use of undercover agents would be unfruitful, *see* First Tierney Aff. ¶ 80, but appears only to consider her further use in that role and makes no reference to at least two other undercover agents employed in the government's investigation, *see* Worthy Motion at 7. In addition, there is no discussion of using undercover agents to record phone calls between such agents and target individuals, which could have been recorded without need of a wiretap order. *See id.* at 7-8.

4. Tierney states that "surveillance alone" would be unlikely to yield further information, *see* First Tierney Aff. ¶ 81, but makes an unconvincing case that surveillance would have been difficult or impossible; indeed, she states elsewhere that the government intends to continue to attempt surveillance, *see id.* ¶ 90; Worthy Motion at 8.

5. In discussing the utility of pen registers and so-called "trap and trace" devices, *see*

First Tierney Aff. ¶ 92, Tierney appears not to appreciate that such devices yield a list of telephone numbers dialed by the subject, telephone numbers of those calling the subject, other details such as call duration and call time, and even all or portions of so-called "SMS," or text, messages in some cases, *see* Worthy Motion at 8. Tierney does not indicate that further use of such information could not be employed in connection with other standard methods available to the government in order to avoid resort to a wiretap. *See id*.

6.     Tierney indicates that the government made only one attempt to use a global positioning system ("GPS") tracking device, stating that such a device would not be useful in following an alleged conspirator to a destination, when in fact its sole attempt failed because the GPS did not work. *See* First Tierney Aff. ¶ 93 & n.45; Worthy Motion at 8.

7.     Tierney claimed that use of a grand jury process would not likely be effective, *see* First Tierney Aff. ¶¶ 94-95, an absurd suggestion in light of the government's extensive use of the grand jury process to conduct discovery, leading to a series of progressively more extensive indictments, *see* Worthy Motion at 9.

8.     Tierney stated that search warrants would be of little use to the government's investigation, *see* First Tierney Aff. ¶ 99, yet she also indicated that the government believed that it knew where drugs allegedly were kept in connection with the alleged conspiracy, *see* Worthy Motion at 9.

Worthy asserts that the second Tierney affidavit incorporates the same flawed statements as detailed above and that, in addition, Tierney states that informants will not likely be of further use, *see* Second Tierney Aff. ¶ 30, but later discloses that the government had developed a new informant whom it evidently had not yet even used, *see id*. ¶ 31, thereby failing to exhaust its use of informants, *see* Worthy Motion at 9.

These arguments are without merit. Tierney did not rely on conclusory statements to demonstrate necessity. Rather, in her first affidavit, she discussed in detail efforts made with respect to the use of confidential sources, controlled drug purchases by such sources and undercover agents, surveillance, pen registers and trap and trace devices, GPS trackers, and trash searches, the limits of each of those methods, and the reasons why she had considered, and at that time rejected, the use of the grand jury, an approach to and/or arrest of target subjects or other suspected wholesale customers, or the obtaining and execution of search warrants. *See* First Tierney Aff. ¶¶ 72-100. In her second affidavit, she described, and provided concrete examples of, the information intercepted through the first wiretap, *see* Second Tierney Aff. ¶ 19, and discussed in detail why the methods covered in the first affidavit, as well as the information gleaned through the first wiretap, did not render the two newly sought wiretaps unnecessary, *see id.* ¶¶ 27-53.

Worthy's specific criticisms do not suffice to raise doubt that "the facts set forth in the application were minimally adequate to support the determination that was made[.]" *Villarman-Oviedo*, 325 F.3d at 9 (citation and internal quotation marks omitted).

In assaying the necessity for a wiretap, the court should consider the nature of the alleged crimes and may give weight to the opinion of investigating agents that, in the circumstances described, other means of investigation were too dangerous and might be counterproductive. *See, e.g., In re Dunn*, 507 F.2d 195, 197 (1st Cir. 1974). "[T]he mere attainment of some degree of success during law enforcement's use of traditional investigative methods does not alone serve to extinguish the need for a wiretap." *United States v. Bennett*, 219 F.3d 1117, 1122 (9th Cir. 2000). Gaps in an investigation, and a need to corroborate confidential source information, are appropriate factors to consider in determining necessity. *See, e.g., United States v. Guerra-*

*Marez*, 928 F.2d 665, 671 (5th Cir. 1991).

Tierney adequately explained the limits of the following and why their use would not accomplish the goals of the investigation:

1.  <u>Confidential informants</u>.  In her first affidavit, Tierney stated that the government had received assistance from five confidential sources of information, SOI1, SOI2, SOI3, SOI4, and SOI5, and one confidential source, CS1.  *See* First Tierney Aff. ¶¶ 19-23,  51.  She explained that no confidential informant had the ability to interact with Nash or other target subjects in the upper hierarchy of the conspiracy, *see id.* ¶ 76, and that there were other reasons why use of these six individuals, individually or collectively, would not achieve the objectives of the investigation, *see id.* ¶ 77.  Specifically, SOI1 had no direct dealings with the target subjects, but rather obtained his/her information from another SOI; SOI2 had generally dealt only with two of the target subjects, Webster and Worthy, had ceased drug activity, and no longer had interaction with any of the target subjects; SOI3 had limited contact with Nash and other members of the alleged hierarchy of the organization and usually went through a third party; SOI4 and CS1 no longer were cooperating with law enforcement; and SOI5 was apparently no longer trusted by the target subjects and no longer had direct dealings with them.  *See id.*

While, as of the time of the second wiretap application, agents had developed an additional source of information, SOI6, who had had personal contact with Worthy ("Moto") and believed that he/she might be able to purchase drugs from Worthy, SOI6 had never before bought drugs from Worthy, had no dealings with any of the other target subjects, had only heard some of their names in conversation with Worthy, did not know Worthy's source of supply, and, therefore, was unlikely to be able to infiltrate the alleged conspiracy in a meaningful way.  *See* Second Tierney Aff. ¶¶ 31, 32(f).

2.      Undercover agents.  In her first affidavit, Tierney explained that undercover agents, like confidential informants, were not privy to the full scope of co-conspirator conversations and activities, and that, in her training and experience, those in the hierarchy of a drug trafficking conspiracy often insulate themselves from those on the lower levels to lessen their exposure to potential witnesses should they be apprehended.  *See id.* ¶ 80.  She supplied a concrete example, from her personal experience in this case as an undercover agent, of precisely that sort of insulation.  *See id.*  She did not detail the experience of other undercover agents participating in the investigation, *see id.*, but she did not need to.  Her statements were at least minimally adequate to support a determination that the utility of undercover agents was limited.[9]

3.      Surveillance.  Tierney adequately explained that, while surveillance had proved useful, for example, in linking certain target subjects to others, and agents planned to continue to use it, the technique was limited in that (i) agents had received information that the target subjects were cautious regarding surveillance, and at least one target subject had employed evasive tactics successfully to evade surveillance, (ii) the geographic scope of the alleged conspiracy, covering numerous locales in Maine, Massachusetts, New York, and possibly elsewhere, made continuous surveillance difficult, and (iii) prolonged surveillance of Nash or other target subjects would create a risk of discovery of the surveillance, creating a further risk of flight or other compromise of the investigation.  *See id.* ¶¶ 81-91.

4.      Pen Registers/Trap and Trace Devices.  Worthy, who bears the burden of demonstrating that the issuance of the wiretap authorization order was improper, cites no authority or evidence for the proposition that pen registers and/or trap and trace devices are

---

[9] While Tierney did not discuss the use of undercover agents to record phone calls, one can reasonably infer from her statements that agents would not have succeeded in making contact with those in the upper hierarchy of the alleged conspiracy and, therefore, would not have been able to record phone calls with those particular target subjects.

capable of capturing the content of text messages, *see* Worthy Motion at 8, a proposition that the government contests, *see* Opposition at 10 n.4.

5. <u>GPS Tracking Devices</u>. Tierney adequately explained why, apart from the malfunction of the one GPS tracking device placed by the government during the course of its investigation, she considered such devices of limited utility: the investigation had shown that the target subjects used numerous vehicles and often rented different vehicles, and even a successful tracking of one or more vehicles would not reveal anything about the activities inside or outside of the vehicle or conversations among target subjects or between target subjects and their associates. *See* First Tierney Aff. ¶ 93 & n.45.

6. <u>Grand Jury</u>. As the government notes, *see* Opposition at 12, in her first affidavit, Tierney detailed the risks and practical problems with the use of the grand jury process for witness testimony, in particular the risk that premature disclosure of the investigation could result in flight of targets and destruction of evidence, *see* First Tierney Aff. ¶¶ 94-95. That the government made use of the grand jury later in the investigation, following the completion of the wiretaps at issue and the gathering of further significant evidence against the target subjects, does not undermine Tierney's assertion that, at these earlier stages of the investigation, the government harbored legitimate concerns regarding disclosure of its ongoing investigation and the potential for flight or destruction of evidence.

7. <u>Search Warrants</u>. Tierney adequately explained why, despite the development of information that Nash and his associates stored drugs at Nash's Buxton residence, the government considered the execution of a search and seizure warrant premature, given that no SOI had contemporaneous information about when drugs were present at the residence, and agents did not know exactly where on the property they were secreted. *See* First Tierney Aff.

¶ 99. Further, Tierney observed that execution of a search warrant would alert the target subject to the existence of the investigation, would prevent agents from identifying and successfully prosecuting other participants, and would likely lead to the discovery of only a single load of drugs and fail to develop sufficient evidence to prosecute Nash, his supplier(s), and other target subjects for the full scope of the alleged drug trafficking activity. *See id.*

Tierney finally also plausibly explained that wiretaps of two additional phones were necessary, in the wake of the first wiretap, because agents still had not been able to determine the full scope of the conspiracy and its players. *See* Second Tierney Aff. ¶¶ 52-53; *see also, e.g., United States v. Garcia*, 232 F.3d 1309, 1315-16 (10th Cir. 2000) (earlier wiretap of suspect's phone did not obviate the need for wiretap of phone of suspected leader of drug conspiracy when the extent of suspected leader's dealings and the source from which he obtained drugs remained unknown, and the fact that he was the highest known participant in the conspiracy made it difficult to collect information on him and his suppliers from lower-level members).

As noted above, "the government is not required to show that other investigatory methods have been completely unsuccessful, nor is the government forced to run outlandish risks or to exhaust every conceivable alternative before resorting to electronic surveillance." *Rivera-Rosario*, 300 F.3d at 19 (citations omitted). Instead, "the government must demonstrate that it has made a reasonable, good faith effort to run the gamut of normal investigative procedures before resorting to means so intrusive as electronic interception of telephone calls." *López*, 300 F.3d 46 at 52 (citation and internal quotation marks omitted).

The government made the required showing by means of the Tierney affidavits. *See id.* at 53 (DEA agent's affidavit was more than minimally adequate to show necessity for wiretap when he (i) described several alternative investigative techniques that had been tried and failed,

appeared unlikely to succeed, might alert the conspirators, or were too dangerous to pursue, (ii) explained that the utility of certain techniques, such as physical surveillance, interrogation of informants, pen-register analysis, and controlled buys, had been exhausted or greatly diminished, and (iii) demonstrated that the traditional techniques employed over the course of several months had failed to establish the identity of some of the conspirators, particularly those at the top of the distribution chain); *Rivera-Rosario*, 300 F.3d at 19 (government made adequate showing of necessity for wiretap when it "describe[d] in detail the surveillance techniques which had been tried, such as physical surveillance, pen registers, closed-circuit television cameras, records checks, and debriefings[,]" "described all the reasons why these tactics had been ineffective or limited in use[,]" and "list[ed] other available methods which were not viable options, including the use of grand jury subpoenas and search warrants, which would have alerted conspirators to the ongoing investigation").

Here, as in *Rivera*, "[w]hile the government could probably have relied on these techniques alone to successfully prosecute a few individuals . . . for drug crimes, the issuing court did not abuse its discretion in concluding that the wiretap was necessary to identify the full scope of the [drug-trafficking] organization and develop an effective case against its members." *Id*. (citation and internal quotation marks omitted).[10]

## B. Probable Cause

Worthy next asserts that the Tierney affidavits did not establish probable cause to believe that the target subjects were committing a crime, or that the intended interceptions would relate to any such crime, in view of the government's heavy reliance, particularly in its first wiretap

---

[10] This analysis is also dispositive of Nash's challenge to the necessity finding. Nash argued that, prior to applying for wiretap authorization, the government had employed other techniques successfully, notably, Tierney's undercover purchases of narcotics from one of the named co-defendants in circumstances in which Nash was in the area and participated in the events. *See* Nash Motion at [2]. Nonetheless, as noted above, Tierney made a detailed and plausible showing that the totality of the information gathered was insufficient to glean the full scope of the conspiracy and prosecute all alleged conspirators.

application, on confidential informants of questionable or unproven reliability. *See* Worthy Motion at 10-12.

He notes, for example, that the government admitted that it had concerns regarding SOI1's credibility, disclosed that SOI3 was paid for his/her services, and disclosed that SOI5 was motivated by his/her interest in receiving immunity from prosecution. *See id.* at 11. He argues that the government offered nothing but naked assertions regarding the credibility of other sources. *See id.*

This challenge, too, is without merit. As the government observes, *see* Opposition at 5-6, Tierney relied in her first affidavit not only on interviews with confidential informants but also on undercover controlled drug purchases, surveillance of the targets, and analysis of the results of pen registers to establish probable cause, *see* First Tierney Aff. ¶¶ 24-71. Moreover, as the government argues, *see* Opposition at 6-7, there were indicia of the reliability of the informants' information, for example, that three of the informants provided information derived from first-hand dealings with target subjects, that the information was detailed, and that informants cross-corroborated each other's information, *see* First Tierney Aff. ¶¶ 19-23, 77; *see also, e.g., United States v. Barnard*, 299 F.3d 90, 93-94 (1st Cir. 2002) (factors to be considered, in assessing the reliability of a confidential informant's information, include the specificity of the information, whether it is first-hand or hearsay, and whether the information has been corroborated).

The First Tierney Affidavit supplied probable cause to believe that a drug trafficking conspiracy crime was being committed and that evidence of that crime would be found through interception of communications to and from the target telephone, which was used by target subject Veronica Brown. *See* First Tierney Aff. ¶ 8. Two confidential informants had identified Brown as an individual selling and delivering crack and heroin for other members of the alleged

conspiracy, including Worthy and Nash. *See id.* ¶¶ 25, 37, 42. On six occasions, undercover agents had purchased drugs from Brown during controlled buys. *See id.* ¶¶ 47-50, 52-55, 63-67. Pen register analysis had disclosed a high volume of calls being made from and received by the target telephone, consistent in Tierney's experience with use of the phone to facilitate drug trafficking, including calls to and from phone numbers associated with other target subjects. *See id.* ¶ 71.

In short, Tierney's affidavit contained sufficient information to convey "a fair probability that a wiretap [would] uncover evidence of a crime." *Fairchild*, 189 F.3d at 775.[11]

## C. Minimization

Worthy, finally, seeks suppression of intercepted communications on the basis of an apparent widespread failure to minimize calls and/or follow adequate minimization procedures. *See* Worthy Motion at 12; Supplemental Brief at 12.

In assessing whether "the minimization effort was managed reasonably in light of the totality of the circumstances[,]" *Charles*, 213 F.2d at 22, relevant factors include "1) the nature and complexity of the suspected crimes; 2) the thoroughness of the government's precautions to bring about minimization; and 3) the degree of judicial supervision over the surveillance process." *López*, 300 F.3d at 57.

In cases in which "an investigation involves a drug ring of unknown proportion, . . . the need to allow latitude to eavesdroppers is close to its zenith." *Charles*, 213 F.3d at 22 (citation and internal quotation marks omitted); *see also, e.g., Bennett*, 219 F.3d at 1124 ("Where, as here, the wire intercept concerns a drug ring, the need to allow latitude to monitoring agents is

---

[11] To the extent that Worthy seeks to assess the credibility of the confidential informants by way of an order that the government disclose their identities and/or an evidentiary hearing, *see* Worthy Motion at 11-12, his request is denied. Worthy offers no reason to believe that Tierney knowingly or recklessly falsified information, or omitted material information, bearing on the informants' credibility. As Worthy acknowledges, *see id.* at 11, Tierney disclosed information material to the confidential informants' motivations and in some cases acknowledged doubts about their credibility, *see* First Tierney Aff. ¶¶ 19-23.

paramount. The fact that the FBI overheard a few innocent conversations does not render its minimization efforts unreasonable. . . . Moreover, if phone conversations include guarded or coded language as in this case, a higher rate of nonrelevant intercepted calls should be expected because it takes longer to figure out the meaning of a particular call.") (citations and internal punctuation omitted); *United States v. Wilson*, 835 F.2d 1440, 1445-46 (D.C. Cir. 1987), *rev'd and remanded on other grounds sub nom. Bloate v. United States*, 130 S. Ct. 1345 (2010) (rejecting defendant's minimization argument in case in which monitored conversations often started with discussion of non-criminal matters, as a result of which agents reasonably could have believed conversation might turn at any moment to criminal activities); *United States v. Cleveland*, 964 F. Supp. 1073, 1093 (E.D. La. 1997) ("When the investigation is focusing on what is thought to be a widespread conspiracy more extensive surveillance may be justified in an attempt to determine the precise scope of the enterprise. This is especially true when the judicially approved wiretap is designed to identify unknown coconspirators.") (citations and internal quotation marks omitted).

"[O]nce the issue of minimization has been raised, the Government must then make a *prima facie* showing that its minimization efforts were reasonable." *United States v. Lopez*, No. CRIM. 99-79-P-C, 2000 WL 761977, at *6 (D. Me. Apr. 28, 2000), *aff'd*, 300 F.3d 46 (1st Cir. 2002). "Once such a showing has been made, the burden shifts to the defendant to demonstrate that more effective minimization could have taken place." *Id*.

The government meets its *prima facie* burden of showing that its minimization efforts were reasonable. In her affidavits supporting the two wiretap applications at issue, Tierney averred that minimization standards would be strictly followed, that monitoring agents would be trained to implement such standards, including respect for the privacy of innocent and privileged

phone calls, and that the government would supply periodic reports to the court touching, *inter alia*, on its minimization efforts. *See* First Tierney Aff. ¶¶ 103-07; Second Tierney Aff. ¶¶ 56-60. Similar procedures and training have been deemed adequate in other cases. *See, e.g., Rivera*, 527 F.3d at 904-05 (monitoring procedures and training were adequate, for minimization purposes, when, *inter alia*, agents and monitors were required to read affidavit submitted in support of wiretap, court order authorizing wiretap, and minimization memorandum written by Assistant United States Attorney, who personally instructed all agents and monitors present on the first day of the wiretap, and minimization memorandum instructed monitors to immediately terminate interception of a call if no target subject or criminal associate was participating, to intercept calls for a reasonable time, usually not more than two minutes, to determine whether the conversation concerned criminal activities, and monitors could ask on-site agent or contact other listed persons if they had questions).

As was appropriate in the circumstances, involving investigation into a drug ring of unknown proportion, with as-yet-unidentified co-conspirators in multiple states and use of code language, monitoring agents were authorized to spot-check seemingly innocent communications to determine whether they had turned to criminal matters. *See* Order Authorizing the Interception of Wire Communications (Docket No. 2), *First Wiretap Case*, at 5; Order Authorizing the Interception of Wire and Electronic Communications (Docket No. 3), *Second Wiretap Case*, at 5; *see also, e.g., Cleveland*, 964 F. Supp. at 1093 ("When nonpertinent calls are short, ambiguous in nature, and/or involve guarded or coded language, agents can hardly be expected to know that the calls are pertinent prior to their termination and hence their interception is entirely reasonable.") (citation and internal quotation marks omitted).

Periodic reports were in fact submitted to the court showing minimization of certain non-pertinent calls, a further factor counseling in favor of a finding of reasonableness. *See* First Report to the Court (Docket No. 4), *First Wiretap Case* (covering period from June 3-16, 2010); Second Report to the Court (Docket No. 7), *First Wiretap Case* (covering period from June 16-30, 2010); First Report to the Court (Docket No. 4), *Second Wiretap Case* (covering period from July 6-24, 2010); Second Report to the Court (Docket No. 7), *Second Wiretap Case* (covering period from July 25-August 5, 2010); *see also Cleveland,* 964 F. Supp. at 1095 ("[T]he government regularly reported the results of its interceptions in written 10 day reports and in oral reports to Judge Polozola. This further supports the general conclusion that [its] minimization efforts were reasonable.").

This *prima facie* case having been made, Nash and Worthy fall short of demonstrating that more effective minimization could have taken place. Nash states that his review of recorded conversations provided by the government revealed that agents recorded several conversations between himself and his children and between children who were in the home from time to time, indicating that the government did not follow minimization requirements. *See* Nash Motion at [2]. Nash does not identify the precise conversations to which he refers. *See id.* In any event, the interception and recording of a few innocent conversations in the context of surveillance of a voluminous number of calls involving a suspected drug ring does not render the government's minimization efforts unreasonable. *See, e.g., Bennett*, 219 F.3d at 1124 ("Even assuming the government improperly intercepted all 267 calls as the appellants assert, this was only 3.65% of the total number of calls intercepted. Such a percentage alone is not fatal.").

Nash's showing, at most, suffices for suppression of the communications he discusses, not wholesale suppression of all intercepted communications. *See, e.g., Charles*, 213 F.3d at 22

(upholding limited suppression remedy in circumstances in which minimization effort was reasonably managed).

Worthy relies on (i) an analysis of line sheets that, for reasons stated above, is fatally flawed, (ii) an argument that the alleged crime at issue was not complex, but rather a garden-variety drug trafficking conspiracy, (iii) an argument, now stricken, that there was inadequate judicial supervision of the government's minimization efforts, and (iv) an argument, now stricken, that the court's wiretap orders were sufficiently facially defective to justify suppression of intercepted communications on that basis alone. *See* Supplemental Brief at 3-12, 19-20. Worthy's argument concerning complexity of the crime, standing alone, is insufficient to justify suppression based on inadequate minimization.[12]

## IV.  Conclusion

For the foregoing reasons, I **DENY** Worthy's motion to strike, **GRANT** the government's motion to strike, **DENY** Worthy's request for an evidentiary hearing, and recommend that the court **DENY** Worthy's and Nash's motions to suppress wiretap evidence.

## *NOTICE*

*A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which de novo review by the district court is sought, together with a supporting memorandum and request for oral argument before the district judge, if any is sought, within fourteen (14) days after being served with a copy thereof.   A responsive memorandum and any request for oral argument before the district judge shall be filed within fourteen (14) days after the filing of the objection.*

---

[12] In any event, although Worthy contends that (i) there was no evidence of money laundering and (ii) the alleged drug crimes were not particularly sophisticated, the investigation having shown that Nash and Phillips traveled regularly to New York, apparently bought modest quantities of cocaine, concealed it in Phillips' person, returned to Maine, stored the cocaine at Nash's house, cooked the cocaine into crack, and sold it through a small group of friends and associates, *see* Supplemental Brief at 7-8, the government's investigation involved "a drug ring of unknown proportion," the very circumstance in which, the First Circuit has noted, "the need to allow latitude to eavesdroppers is close to its zenith[,]" *Charles*, 213 F.3d at 22 (citation and internal quotation marks omitted).

***Failure to file a timely objection shall constitute a waiver of the right to <u>de novo</u> review
by the district court and to appeal the district court's order.***

Dated this 15th day of April, 2011.

<u>/s/  John H. Rich III</u>
John H. Rich III
United States Magistrate Judge
